**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

F I L E D

OCT 2 8 2016

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

UNITED STATES OF AMERICA )
)
v. )        Criminal No. 3:12CR47–HEH
)
TORRY VON ZENON, )
)
      Petitioner. )

## MEMORANDUM OPINION
### (Denying 28 U.S.C. § 2255 Motion)

Torry Von Zenon, a federal inmate proceeding by counsel, submitted this motion

under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence ("§ 2255 Motion,"

ECF No. 401). Zenon contends that he experienced ineffective assistance of counsel[1] in

conjunction with his pre-trial proceedings. Specifically, Zenon demands relief because:

> Claim One: "Movant's trial counsel, John Mann, Esq., was ineffective in his representation in that he failed to relay any information regarding the Sentencing Guidelines, how they work and how they applied to the Movant's offense." (Supp. to § 2255 Mot. 2, ECF No. 401–1.)

> Claim Two: "Trial Counsel failed to investigate and review discovery and apprise the movant of the same and said acts or omissions fall within the purview of ineffective assistance of counsel." (*Id.* at 4 (emphasis omitted).)

The Government responded, asserting that Zenon's claims lack merit. (ECF No. 462.)

For the reasons set forth below, Zenon's § 2255 Motion (ECF No. 401) will be denied.

---

[1] "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI.

# I.   PROCEDURAL HISTORY

On April 3, 2012, a grand jury charged Zenon with one count of conspiracy to possess with intent to distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine hydrochloride, and one count of attempting to possess with the intent to distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine hydrochloride. (Indictment 1–10, ECF No. 3.) On November 7, 2012, the grand jury returned a Superseding Indictment, again charging Zenon with one count of conspiracy to possess with the intent to distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine hydrochloride (Count One), and one count of attempting to possess with the intent to distribute five kilograms or more of cocaine hydrochloride (Count Two). (Superseding Indictment 1–7, ECF No. 156.) On January 24, 2013, a jury found Zenon guilty of both counts of the Superseding Indictment. (ECF No. 270, at 1–2.)

On June 12, 2013, the Court entered judgment against Zenon and sentenced him to 384 months of imprisonment on each count, to be served concurrently. (J. 2, ECF No. 338.) Zenon appealed. (ECF No. 340.) On appeal, Zenon and co-defendant Vincent Williams challenged the sufficiency of the evidence supporting their convictions. *United States v. Williams*, 569 F. App'x 169, 170 (4th Cir. 2014). The United States Court of Appeals for the Fourth Circuit affirmed Zenon's convictions. *Id.* at 173. The United States Supreme Court subsequently denied Zenon's petition for a writ of certiorari. *Zenon v. United States*, 135 S. Ct. 297 (2014).

2

## II.    SUMMARY OF EVIDENCE

The Fourth Circuit summarized the evidence of Zenon's guilt as follows:

> Vincent [Williams's] stepfather Dion Williams ("Dion") was a drug dealer in Richmond Virginia.  Beginning in 2012, he contacted a man named Hiram Alvarez, who lived in California, concerning Dion's interest in purchasing a large quantity of cocaine.  Dion told Alvarez he could raise as much as $2.5 million for the purchase of 100 kilograms of cocaine.  Alvarez, in turn, contacted a man known to him by the name "Jose."  Unbeknownst to Alvarez or Dion, Jose, whose full name was Jose Burgueno Urias, was working as a confidential source for the Drug Enforcement Administration ("DEA"), and Urias reported the solicitation to the DEA.  The DEA and Urias agreed that Urias would set up the transaction, even though the drugs would never actually be delivered.
>
> On that basis, Urias undertook to set up the deal.  Dion offered to allow Alvarez or his representative the chance to come to the East Coast and make the transaction with Dion.  Alvarez selected Pedro Santana to be his agent.  Accordingly, Urias and Santana, along with one other confidential informant, flew into Richmond, Virginia on January 26, 2012.  Upon arriving, they rented a car, drove to a Baltimore-area hotel, and met with Dion in the early morning of January 27.  At approximately 9:30 a.m., Dion led the group to a nearby apartment in a gated complex.  The apartment was leased to Zenon.
>
> The fact that the apartment was in a gated community made it difficult for law enforcement to conduct surveillance.  However, almost immediately after Dion brought Urias and Santana to the apartment, DEA Special Agent Jason Alznauer observed Zenon standing near the apartment complex's front gate where he appeared to be watching cars coming and going through the gates.  In fact, Alznauer told his partner that he believed Zenon was conducting counter-surveillance.  Zenon was wearing a black knit skull cap and black puffy jacket.  Zenon was observed soon thereafter standing at the end of the apartment building talking on a cellular telephone and then walking around the back of the building.  Within a few minutes, a man matching Zenon's description was observed at the other corner of the apartment complex, standing in the middle of the road, looking around.
>
> The meeting inside the apartment lasted less than an hour, during which time Dion showed the confidential informants approximately $300,000 in currency and told them he would need more time to obtain the

rest of the money.[2]   At about 10:30 a.m., Santana and the confidential informant left the apartment and returned to the hotel.

Dion later contacted them and they agreed to return to the apartment around 6:00 p.m.   Approximately 10 minutes before the men arrived, officers observed a green pickup truck drive into Zenon's garage, and they saw Zenon exit the vehicle wearing a black puffy jacket, a reflective vest, and a hardhat.  He removed a plastic trashbag from the truck and placed it in front of the garage, then moved the truck out of the garage and parked it in a parking space nearby.  Zenon next reentered the garage on foot and shut the outer door.

When Santana, Dion, and the informants arrived a few minutes later, they parked in the same garage and entered the apartment through stairs from the garage.  Vincent was waiting in the garage when the men arrived. Vincent picked up a box containing a large amount of currency and carried it into the apartment.

Inside the apartment, Dion, Vincent, the two informants, and Santana spent about two and a half hours counting the currency, primarily using electric money counters.  Vincent, who already knew how to operate the machines, was helping "during the entire time."  In Vincent's presence, Dion proceeded to discuss the drug deal and the future dealings that Dion anticipated.  He specifically noted that Vincent had not enjoyed studying or working in a restaurant and that the only thing he did like was "counting kilos and counting paquetes," which Urias testified referred to money packages and cocaine.  Urias testified that he also had discussions at that time with Dion about the 100 kilograms of cocaine that Urias was going to give him in exchange for the money.  Urias explained that because the cocaine kilograms were square in shape, he referred to them as "squares." Urias further testified that Dion had told him at this time that it would be Vincent who would be coming to the apartment to receive future cocaine purchases.  Urias testified that Dion had advised him that they were safe and secure because Dion had people outside "guarding and to make sure no police came."

As the amount of money the men had counted approached $1.5 million, Urias told Dion that they would begin the process of retrieving and bringing up the 100 kilograms of cocaine, and Urias, Santana, and the other informant left the apartment.  Shortly thereafter, a S.W.A.T. team made entry into the apartment through the front door and officers executed a search warrant on the apartment.  The first officer to enter observed Vincent

---

[2] When the men went upstairs, they encountered Vincent sleeping on a sofa.  Dion told Urias not to worry because Vincent was his son.  Vincent got up and went into the bedroom and did not come out during that meeting.

flee the living room to the back of the apartment carrying what appeared to be a handgun. Officers found Vincent hiding in a bathroom, and they located a .45 caliber handgun along the path Vincent had taken toward the bathroom. Officers found Dion and Zenon hiding in the pantry in the kitchen.

The officers also found approximately $1.5 million stacked in plain view on the carpet in the living room; two money counting machines, both of which were turned on, in the kitchen; a .44 caliber revolver on the kitchen counter near where the officers had found Zenon; 15 cellular telephones; packing tape to package the cash; and a black puffy coat, hard hat, and reflective vest, matching the description of those that Zenon had been seen wearing earlier.

*United States v. Williams*, 569 F. App'x 169, 170–72 (4th Cir. 2014) (internal citations omitted).

### III.   INEFFECTIVE ASSISTANCE OF COUNSEL

To demonstrate ineffective assistance of counsel, a convicted defendant must show first, that counsel's representation was deficient and second, that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To satisfy the deficient performance prong of *Strickland*, the convicted defendant must overcome the "'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'" *Burch v. Corcoran*, 273 F.3d 577, 588 (4th Cir. 2001) (quoting *Strickland*, 466 U.S. at 689). The prejudice component requires a convicted defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In analyzing ineffective assistance of counsel

5

claims, it is not necessary to determine whether counsel performed deficiently if the claim is readily dismissed for lack of prejudice. *Id.* at 697.

### A.    Claim One

In Claim One, Zenon contends that counsel "failed to relay any information regarding the Sentencing Guidelines, how they work and how they applied to the Movant's offense." (Supp. to § 2255 Mot. 2.) Specifically, Zenon believes that trial counsel John Mann "was pre-occupied with the movant pleading guilty to the offenses that he was never made aware of the significance of the plea agreement in comparison to the possible sentence he could have received because counsel never informed him of the recommended sentencing range, if he went to trial." (*Id.*) Zenon states:

> The movant further submits that at no time during the course of Mr. Mann's representation was he aware that his Base Offense level was 36 and his criminal history category was III, thereby giving him a sentencing range of 235–293 months and with his Acceptance of Responsibility he would have received a reduced sentencing range of 168-210 months. Had movant been aware of the same, he would have accepted the lesser offense of maintaining a drug involved premises which had a base[] offense level of 26 and with acceptance of responsibility he would have had a sentencing range of 57–71 months.

(*Id.*) According to Zenon, "this failure by trial counsel precluded the movant from being able to make an informed decision." (*Id.* at 3.) It is clear from Zenon's claim that his concern does not lie with counsel's performance with respect to advising him as to the likelihood of acquittal if he rejected a plea offer. Rather, Zenon's primary concern was about his sentencing exposure.

6

In response, trial counsel John Mann avers that he discussed "a possible plea agreement" with the Government. (Gov't's Resp. Ex. 1 ("Mann Aff.") ¶ 4, ECF No. 462–1.) The Government "stated that if Zenon pled guilty to a violation of 21 USC § 856,[3] which would have provided a maximum sentence of 20 years [of] incarceration, the pending charges would be dismissed." (*Id.*) Mann conveyed the Government's plea offer to Zenon "on several occasions." (*Id.* ¶ 5.) Zenon "stated that he would accept the plea offer if the Government would place a 5-year cap on any sentence. The Government refused to accept this offer." (*Id.*)

During plea negotiations, Mann "advised Zenon that he could receive a 3 point reduction for acceptance of responsibility" under the Sentencing Guidelines. (*Id.* ¶ 7.) Mann also "advised Zenon that if he testified against his co-defendant, Dion Williams, that he would receive not only acceptance of responsibility . . . , but could also receive further consideration from the government on a Rule 35." (*Id.* ¶ 6.) Zenon refused to testify against Williams (*id.*), and "continued to refuse to accept the plea offer from the Government, and was adamant about going to trial" (*id.* ¶ 8). Mann "do[es] not recall if

---

[3] The statute provides, in pertinent part:

> Except as authorized by this subchapter, it shall be unlawful to—
> (1) knowingly open, lease, rent, use, or maintain any place, whether permanently or temporarily, for the purpose of manufacturing, distributing, or using any controlled substance;
> (2) manage or control any place, whether permanently or temporarily, either as an owner, lessee, agent, employee, occupant, or mortgagee, and knowingly and intentionally rent, lease, profit from, or make available for use, with or without compensation, the place for the purpose of unlawfully manufacturing, storing, distributing, or using a controlled substance.

21 U.S.C. § 856(a).

[he] specifically discussed with Zenon the sentencing range if he pled guilty to an amended charge of 21 USC § 856, because Zenon adamantly refused to plead guilty to that charge, and wanted to go to trial." (*Id.* ¶ 9.)

"During plea negotiations defendants are 'entitled to the effective assistance of competent counsel.'" *Lafler v. Cooper*, 132 S. Ct. 1376, 1384 (2012) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970)). As explained below, Zenon fails to demonstrate prejudice. As the Supreme Court has explained:

> To show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's [allegedly] deficient performance, defendants must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel. Defendants must also demonstrate a reasonable probability the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it, if they had the authority to exercise that discretion under [federal] law.

*Missouri v. Frye*, 132 S. Ct. 1399, 1409 (2012). Such a showing requires a convicted defendant to "present some credible, non-conclusory evidence that he would have [accepted the proffered plea] had he been properly advised." *Sanders v. United States*, 341 F.3d 720, 722 (8th Cir. 2003) (quoting *Engelen v. United States*, 68 F.3d 238, 241 (8th Cir. 1995)). Zenon has not done so. The record reflects that Zenon would only "accept the plea offer if the Government would place a 5-year cap on any sentence. The Government refused to accept this offer." (Mann Aff. ¶ 5.) Zenon continued to refuse the plea offer after Mann explained that Zenon could receive a three-point reduction for acceptance of responsibility. (*Id.* ¶¶ 7–8.) Thus, it was Zenon's dogged insistence that

he be sentenced to no more than five years of incarceration in exchange for a plea of guilty, rather than any alleged misadvice by Mann, that caused Zenon to reject the plea offer.

Moreover, "[a] defendant who maintains his innocence at all the stages of his criminal prosecution and shows no indication that he would be willing to admit his guilt undermines his later § 2255 claim that he would have pleaded guilty if only he had received better advice from his lawyer." *Sanders*, 341 F.3d at 723 (citing *United States v. Stevens*, 149 F.3d 747, 748 (8th Cir. 1998); *Engelen*, 68 F.3d at 241); *see Chesney v. United States*, 367 F.3d 1055, 1060 (8th Cir. 2004). During trial, Zenon decided to take the stand and

> testified he left the apartment complex early on the morning of his arrest without his wallet, ate breakfast, and spent the entire day at the mall only to return just before the police arrived. [He] also testified he returned by entering through the garage, came into the apartment, and did not see the firearm or the $1,500,000 piled on the living room floor as it was dark.

(Pre-Sentence Investigation Report ¶ 44, ECF No. 324.) Conversely,

> three witnesses testified that they saw **Torry Von Zenon** conducting counter-surveillance in and around the apartment complex beginning around 10:00 a.m. on the day of his arrest, to include seeing him at the front gate and a short time later on either the side of his specific apartment building. At approximately 6:00 p.m. on this same day, he was also seen arriving in a pick-up truck parking in the garage, unloading a bag, and then pulling the truck back out of the garage and parking it in the lot. The informants arrived 10 minutes later and never saw **Torry Von Zenon**, which is consistent with him being outside and walking around to provide security. At 9:00 p.m. on this same day, the informants left the apartment, having never seen **Torry Von Zenon**, and approximately 10 minutes later, the search warrant was executed. . . . [S]everal SWAT officers testified the apartment was not dark.

9

(*Id.* ¶ 45.) Given his willingness to provide false testimony at trial, the Court finds "palpably incredible" Zenon's conclusory assertions that if he had received better advice from counsel he would have agreed to the plea offer. *United States v. Lemaster*, 403 F.3d 216, 221 (4th Cir. 2005) (internal quotation marks omitted) (citation omitted); *see Sanders*, 341 F.3d at 722–23. For these reasons, Claim One will be dismissed.

### B.    Claim Two

In Claim Two, Zenon alleges that trial counsel "failed to investigate and review discovery and apprise the movant of the same." (Supp. to § 2255 Mot. 4.) According to Zenon, he "requested of trial counsel to listen to and view any wire taps, videos, surveillance pictures, etc." (*Id.*) However, he "was unable to listen to or view any of the evidence." (*Id.*) Moreover, "trial counsel had not viewed said evidence nor was in a position to give the movant a clear perspective of how compelling the Government's case was against him." (*Id.* at 4–5.)

In response, Mann states that he met with Zenon "on at least 17 occasions while he was incarcerated at Central Virginia Regional Jail in Orange, VA and at the Pamunkey Regional Jail in Hanover County, VA." (Mann Aff. ¶ 1.) Moreover, Mann "met with Zenon on a number of other occasions at the United States District Courthouse." (*Id.*) During those meetings, Mann

> shared with Zenon all the evidence against him provided by the
> Government, which included transcripts of wiretaps of conversations
> between Alvarez and Dion Williams, as well as many other documents
> including photographs provided by the Government and photographs taken
> by [Mann] on [his] trip to Owings Mill, MD to view the scene of the

10

alleged offense.  [Mann] believe[s] that [he] had the transcripts of the wiretaps reviewed for accuracy.

(*Id.* ¶ 10.)

As an initial matter, Zenon fails to specify the content of the discovery that was allegedly kept from him.  This type of conclusory allegation cannot provide relief under § 2255.  *See United States v. Dyess*, 730 F.3d 354, 359–60 (4th Cir. 2013) (noting that "'vague and conclusory allegations contained in a § 2255 petition may be disposed of without further investigation by the District Court'" (quoting *United States v. Thomas*, 221 F.3d 430, 437 (3d Cir. 2000))); *United States v. Wilson*, Nos. 7:13CR00010, 7:15CV80831, at *3 (W.D. Va. May 27, 2016) (denying § 2255 movant's claim that "counsel neither reviewed the discovery against him, nor gave him an opportunity to review it" as a "conclusory allegation").

To prevail on his allegation that counsel conducted an inadequate investigation, Zenon must identify what an adequate investigation would have revealed.  *See Beaver v. Thompson*, 93 F.3d 1186, 1195 (4th Cir. 1996) ("[A]n allegation of inadequate investigation does not warrant habeas relief absent a proffer of what favorable evidence or testimony would have been produced." (citing *Bassette v. Thompson*, 915 F.2d 932, 940–41 (4th Cir. 1990))).  Zenon has failed to present any evidence as to what more an adequate investigation of the evidence by counsel would have revealed.  *See Sanders v. United States*, 373 U.S. 1, 19 (1963) (finding denial of § 2255 motion appropriate where it "stated only bald legal conclusions with no supporting factual allegations").  For

example, Zenon fails to explain what more counsel could have obtained from the tapes of

the wiretaps, when none of the audio recordings contained Zenon's voice. (*See* Gov't's

Resp. 10.) Zenon has simply failed to overcome the "'strong presumption' that counsel's

strategy and tactics fall 'within the wide range of reasonable professional assistance.'"

*Burch*, 273 F.3d at 588 (quoting *Strickland*, 466 U.S. at 689).

Nor has Zenon demonstrated prejudice from counsel's alleged deficient

performance. Zenon vaguely suggests that "[i]f the ethical responsibility to diligently

investigate and defend was adhered to by counsel, it is more than reasonable to believe

that the outcome would have been different and a plea would have been accepted."

(Supp. to § 2255 Mot. 6.) However, as discussed *supra* in Part III.A., Zenon was only

willing to plead guilty if the Government agreed to cap his sentence at five years of

incarceration. Moreover, given Zenon's willingness to provide false testimony at trial,

*see supra* Part III.A., Zenon's conclusory assertions that he would have agreed to the plea

offer if counsel had conducted a better investigation are "palpably incredible." *Lemaster*,

403 F.3d at 221 (citation omitted) (internal quotation marks omitted). Because Zenon has

failed to demonstrate deficient performance of counsel or resulting prejudice, Claim Two

will be dismissed.

## IV.   CONCLUSION

For the foregoing reasons, Zenon's § 2255 Motion (ECF No. 462) will be denied.

The action will be dismissed. A certificate of appealability will be denied.

An appropriate Order shall issue.

/s/
_____
HENRY E. HUDSON
UNITED STATES DISTRICT JUDGE

Date: Oct. 28, 2016
Richmond, Virginia

13